*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2018 UT 29**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

THOMAS E. MOWER,
*Appellant,*

*v.*

NANCY BAIRD
and THE CHILDREN'S CENTER,
*Appellees.*

No. 20160149
Filed July 5, 2018

On Direct Appeal

Third District, Salt Lake
The Honorable Robert P. Faust
No. 150905061

Attorneys:

Douglas B. Thayer, Mark R. Nelson, Lehi, David L. Arrington, Salt
Lake City, for appellant

Gregory J. Sanders, Sarah C. Vaughn, Salt Lake City, for appellees

Troy L. Booher, Julie J. Nelson, John J. Hurst, Salt Lake City, for
amici National Association of Social Workers; National
Association of Social Workers, Utah Chapter; Utah Psychological
Association; Utah Medical Association; Utah Psychiatric
Association; and Utah Academy of Child and Adolescent
Psychiatry

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE PEARCE, and JUDGE PETTIT joined.

Due to her retirement, JUSTICE DURHAM did not participate herein;
DISTRICT COURT JUDGE KARA L. PETTIT sat.

JUSTICE PETERSEN became a member of the Court on November 17, 2017, after oral argument in this matter and accordingly did not participate.

———————

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶ 1    The law isn't good-for-nothing when a therapist causes a child to falsely accuse a parent of sexual abuse.

¶ 2    In March 2011, Thomas Mower's now ex-wife, Lidia Mower, began taking their four-year-old daughter, T.M., to The Children's Center for therapy. The Children's Center provided services to T.M. through Nancy Baird. During Ms. Baird's treatment of T.M., she allegedly engaged in practices that were both contrary to commonly-accepted treatment protocol and expressly rejected by the profession. As a result of Ms. Baird's treatment, false allegations of sexual abuse were levied against Mr. Mower.

¶ 3    Mr. Mower sued Ms. Baird and The Children's Center (collectively, the defendants) for the harm he suffered as a result of T.M.'s treatment. The defendants moved to dismiss these claims under rule 12(b)(6) of the Utah Rules of Civil Procedure. The district court granted the defendants' motion on the grounds that therapists don't have "a duty of care to potential sexual abusers when treating the alleged victim."

¶ 4    Underlying the district court's decision are two issues of first impression: (1) whether a treating therapist working with a minor child owes a traditional duty of reasonable care to a nonpatient parent to refrain from giving rise to false memories or false allegations of sexual abuse by that parent; and, if so, (2) whether we should extend that duty to exercising reasonable care when placing a nonpatient parent at risk of severe emotional distress. Under the framework for analyzing whether a traditional duty exists, established by *B.R. ex rel. Jeffs v. West*, 2012 UT 11, 275 P.3d 228, we determine that a duty to a nonpatient parent exists but limit that duty to an affirmative act: the affirmative act of recklessly giving rise to false memories or false allegations of childhood sexual abuse by that parent. Similarly, we conclude that a treating therapist owes a duty to refrain from affirmatively causing the nonpatient parent severe emotional distress by

2

recklessly giving rise to false memories or false allegations of childhood sexual abuse by that parent. Accordingly, we reverse the district court's dismissal of Mr. Mower's claims and remand for further proceedings.[1]

## BACKGROUND

¶ 5   Because this case is before us on appeal of a motion to dismiss for failure to state a claim, we, like the district court, take the factual allegations in the complaint as true. *See Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 2, 243 P.3d 1275; *Brown v. Div. of Water Rights of the Dep't of Nat. Res.*, 2010 UT 14, ¶ 10, 228 P.3d 747.

¶ 6   While married, Ms. and Mr. Mower had one daughter together, T.M. In March 2011, Ms. Mower began bringing T.M., then four-and-a-half years old, to The Children's Center to see Ms. Baird, a Licensed Clinical Social Worker. She did this without Mr. Mower's knowledge or consent.

¶ 7   By the end of T.M.'s initial intake assessment, Ms. Baird allegedly assumed, based on information provided by Ms. Mower and Ms. Baird's observation of T.M., that T.M. had been sexually abused by Mr. Mower. Because Ms. Baird assumed that sexual abuse had likely occurred, she called the Division of Child and Family Services (DCFS) to make a report. DCFS told Ms. Baird that the information didn't presently warrant a report but asked her to continue to gather information.

¶ 8   According to established guidelines regarding treatment for allegations of potential sexual abuse,[2] Ms. Baird should have ended all therapy and allowed a forensic interviewer (a role for

---

[1] We don't, however, reach what duty, if any, The Children's Center owes to Mr. Mower in his medical malpractice claim—an issue not truly before us. The district court dismissed all of Mr. Mower's claims on the grounds that a therapist owes no duty to an alleged sex abuser. We reverse this decision because we conclude that a duty does exist. On remand, the district court will have to determine whether The Children's Center owes a duty to Mr. Mower in this particular instance.

[2] Mr. Mower hasn't alleged the specific guidelines or how they're established in his complaint. We draw the inference that he'll be able to do so before trial.

which Ms. Baird wasn't trained) to take over to determine if sexual abuse had occurred. Ms. Baird, however, purportedly decided to act in the capacity of a combined therapist and investigator and continued with her therapy/interview sessions until October 2012. Ms. Baird allegedly conducted these sessions with methods that were tainted by confirmatory bias, diagnostic suspicion bias, and socially desired responses, and were therefore unreliable. She repeatedly asked T.M. questions "designed to corroborate claims of sexual abuse" and "that further reinforced the tainting of TM's memory." This type of questioning creates a high risk that a child will "confuse what she has heard through repeated questioning as something she actually experienced." Compounding this problem, Ms. Baird failed to electronically record the initial sessions or take adequate notes of the questions and answers given, which might have made it possible to later determine the accuracy of T.M.'s statements.

¶ 9   During Ms. Baird's treatment of T.M., The Children's Center purportedly provided little to no training, supervision, or oversight. Ms. Baird had "no knowledge of or training in false memory, confirmatory bias, diagnostic suspicion bias, or social desirability responses." Ms. Baird disregarded standardized test results when diagnosing T.M., kept insufficient records of the sessions, repeatedly questioned T.M. about the same events, and served an inappropriate dual role: therapist for T.M. and investigator for DCFS.

¶ 10  Mr. Mower first found out about T.M.'s therapy from papers Ms. Mower filed in their divorce proceedings in summer 2012. Also in 2012, based at least in part upon Ms. Baird's interviews with T.M., DCFS made a "supported" finding of sexual abuse against Mr. Mower. Mr. Mower challenged that finding in juvenile court, resulting in DCFS changing the finding from "supported" to "unsupported." The juvenile court then found the allegations "unsubstantiated."

¶ 11  Ms. Baird's treatment allegedly damaged the healthy parent-child relationship Mr. Mower and T.M. once enjoyed. Additionally, the false allegations of sexual abuse have harmed and stigmatized Mr. Mower's reputation. Mr. Mower has also

4

allegedly suffered significant emotional turmoil and pain as a result of the defendants' negligence.[3]

¶ 12   As a consequence, Mr. Mower filed this lawsuit against the defendants for the harm he allegedly suffered as a result of T.M.'s treatment, asserting causes of action for (1) medical malpractice/negligence against The Children's Center, (2) medical malpractice/negligence against Ms. Baird, and (3) respondeat superior against The Children's Center.[4] The defendants filed a motion to dismiss these claims under rule 12(b)(6) of the Utah Rules of Civil Procedure. The district court granted the defendants' motion, holding that therapists don't have a duty "to potential sexual abusers when treating the alleged victim."

¶ 13   Mr. Mower appeals this decision. Utah Code section 78A-3-102(3)(j) gives us jurisdiction.

## STANDARD OF REVIEW

¶ 14   "[W]hether a 'duty' exists is a question of law . . . ." *Weber ex rel. Weber v. Springville City*, 725 P.2d 1360, 1363 (Utah 1986) (citation omitted). We review questions of law "under a correctness standard." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991) (citations omitted).

## ANALYSIS

¶ 15   The district court dismissed this case on the grounds that a treating therapist owes no duty of care "to potential sexual abusers when treating the alleged victim." If such a duty does exist, the parties to this action disagree about whether it includes a duty to not affirmatively cause severe emotional harm. We must therefore determine whether Ms. Baird did in fact owe Mr. Mower a duty and, if so, whether it extends to emotional harm. We begin by determining that Ms. Baird owes Mr. Mower a limited traditional duty. Next, to help contextualize the disagreement between the parties, we discuss some general principles of negligence for legal context and the development of negligent

---

[3] Not all of these alleged harms are compensable. *See infra* ¶¶ 46, 100 n.20.

[4] T.M. isn't a party to this action. Mr. Mower's claims aren't derivative claims based on the breach of any duty owed to T.M. but his own claims for his own injuries.

infliction of emotional distress law in Utah and around the country. Then we consider whether we should adopt a limited duty similar to that provided in section 47(b) of the *Restatement (Third) of Torts* and, if so, what the appropriate test would be. RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47(b) (AM. LAW INST. 2012). And, after concluding that a limited duty test should exist, we go on to determine whether a limited emotional distress duty also exists.

## I. TREATING THERAPISTS OWE A TRADITIONAL DUTY TO NOT AFFIRMATIVELY ACT IN A MANNER THAT RECKLESSLY CAUSES PHYSICAL HARM TO NONPATIENT PARENTS OR THEIR PROPERTY IN THE THERAPIST'S TREATMENT OF THE PARENT'S MINOR CHILD FOR ALLEGED SEXUAL ABUSE

¶ 16   The threshold question in a negligence claim is whether the defendant owed a duty to the plaintiff. *See B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5 n.2, 275 P.3d 228. "An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." *Id.* ¶ 21 n.11 (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 7(a) (AM. LAW INST. 2012)). A duty to act with reasonable care "must be determined as a matter of law and on a categorical basis for a given class of tort claims." *Id.* ¶ 23 (citations omitted). "We therefore analyze each pertinent factor in the duty analysis 'at a broad, categorical level for a class of defendants' without focusing on the particular circumstances of a given case." *Scott v. Universal Sales, Inc.*, 2015 UT 64, ¶ 33, 356 P.3d 1172 (quoting *Jeffs*, 2012 UT 11, ¶ 23).

¶ 17   In *Jeffs*, we established a five-factor test for determining "whether a defendant owes a duty to a plaintiff":

> (1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or likelihood of injury; (4) "public policy as to which party can best bear the loss occasioned by the injury"; and (5) "other general policy considerations."

*Jeffs*, 2012 UT 11, ¶ 5 (citations omitted). "Not every factor is created equal, however. . . . [S]ome factors are featured heavily in certain types of cases, while other factors play a less important, or

different, role." *Id.* The first two factors are considered "plus" factors used to determine whether a duty would normally exist. *See id.* The final three factors are considered "minus" factors "used to eliminate a duty that would otherwise exist." *Id.*

¶ 18 In this case, we're required to determine whether a treating therapist owes a duty of care to a nonpatient parent in the treatment of the parent's minor child for potential sexual abuse alleged against that parent.[5] Applying the *Jeffs* factors, we find that a treating therapist does owe such a duty, albeit a limited one, to nonpatient parents.

*A. The* Jeffs *"Plus" Factors Favor Creating a Duty*

¶ 19 When determining whether a duty exists under the *Jeffs* factors, the two "plus" factors "are interrelated". *Id.* ¶ 7. The first factor stems from "[t]he long-recognized distinction between acts and omissions—or misfeasance and nonfeasance." *Id.* "Acts of misfeasance, or active misconduct working positive injury to others, typically carry a duty of care." *Id.* (citation omitted) (internal quotation marks omitted). Conversely, "[n]onfeasance— passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant"—only gives rise to a duty when a special legal relationship exists. *Id.* (citation omitted) (internal quotation marks omitted).

¶ 20 In cases of misfeasance, the "plus" factor analysis almost always rests on the first factor—the affirmative misconduct creates a duty of care and a special legal relationship isn't

---

[5] Our analysis today only applies where a parent is suing the therapist for negligence in the treatment of the parent's minor child. We recognize that the factors we discuss in Parts I and IV might weigh differently when the patient is an adult or the alleged abuser is an individual other than the child's parent. Because these issues aren't before us, we don't consider them today. *Cf. Roberts v. Salmi*, 866 N.W.2d 460, 469 n.5 (Mich. Ct. App. 2014) (leaving the determination of whether a therapist owes a duty "to other persons who might foreseeably be harmed by a patient's false memory of sexual abuse, such as a pastor or teacher" to future courts).

required.[6] *See id.* ¶¶ 6–7, 10. If, however, a duty isn't established under the first factor, as in cases of nonfeasance, the second factor can be "used to impose a duty where one would otherwise not exist." *Id.* ¶ 5.

¶ 21 By providing therapy to a minor child, a treating therapist may engage in "active misconduct" if he or she "uses inappropriate treatment techniques or inappropriately applies otherwise proper techniques." *Roberts v. Salmi*, 866 N.W.2d 460, 474 (Mich. Ct. App. 2014) [hereinafter *Roberts I*];[7] *cf. Scott*, 2015 UT 64, ¶ 36 ("By placing inmates in the community, the County engaged in 'active misconduct' if its screening procedures were inadequate to discover obvious dangers work-release participants might pose to the public."). We're not asking whether a treating therapist "has a duty to ensure that a patient's allegations are true before reporting them or to otherwise protect a patient's parents from potentially false allegations of sexual abuse." *Roberts I*, 866 N.W.2d at 470. Rather, it's a question of misfeasance—such as "the negligent use of therapeutic techniques on a patient that actually *cause* the patient to have a false memory of childhood sexual abuse." *Id.* (citations omitted). Thus, this isn't a case of passive inaction that results in an injury to another; this conduct involves an affirmative act that establishes that a duty would normally exist.

---

[6] This isn't to say, however, that a special legal relationship won't strengthen the "plus" factors to establish a duty in the face of strong "minus" factors. But Mr. Mower hasn't argued that a special legal relationship exists here, and thus we don't consider this factor in our analysis.

[7] The Michigan Supreme Court originally granted leave to appeal this decision to "address whether a mental health professional has a duty of care to third parties who might foreseeably be harmed by the mental health professional's use of techniques that cause a patient to have false memories of sexual abuse." *Roberts v. Salmi*, 868 N.W.2d 911, 911 (Mich. 2015) (Mem), *vacated*, 877 N.W.2d 903 (Mich. 2016) (Mem). However, after receiving briefing and hearing oral arguments, the Michigan Supreme Court vacated the leave to appeal "because [they] [we]re no longer persuaded that the questions presented should be reviewed by [the Supreme] Court." *Roberts*, 877 N.W.2d at 903–04.

¶ 22   For this reason, a special legal relationship need not exist for a treating therapist to owe a duty to a nonpatient parent; the treating therapist's affirmative acts are sufficient. But, as we explain below, while the "minus" factors don't favor entirely eliminating this duty to exercise reasonable care when undertaking the affirmative act of providing therapy, they do warrant limiting this duty to refraining from recklessly giving rise to false memories or allegations of sexual abuse.

*B. The* Jeffs *"Minus" Factors Weigh in Favor of Creating a Limited Duty*

¶ 23   The defendants and their amici ask us to conclude— based mainly on policy considerations—that a treating therapist doesn't owe a duty to anyone other than his or her patient. We find no basis for categorically excluding all treating therapists from liability for carelessly providing therapy to a minor child in a manner that affirmatively harms the nonpatient parent. Instead, we hold that such a duty exists, but policy considerations advise limiting the duty to a recklessness standard.

1. Foreseeability

¶ 24   The foreseeability analysis for duty is distinct from that for breach or proximate cause. *Jeffs*, 2012 UT 11, ¶ 24. "[F]oreseeability in [a] duty analysis is evaluated at a broad, categorical level." *Id.* ¶ 25. This analysis focuses on "'the general relationship between the alleged tortfeasor and the victim' and 'the general foreseeability' of harm" rather than "'the specifics of the alleged tortious conduct' such as 'the specific mechanism of the harm.'" *Id.* (quoting *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 20, 215 P.3d 152).

¶ 25   Thus, "[t]he appropriate foreseeability question for [a] duty analysis is whether a category of cases includes individual cases in which the likelihood of some type of harm is sufficiently high that a reasonable person could anticipate a general risk of injury to others." *Id.* ¶ 27.[8] Here, the relevant category of cases

---

[8]   The defendants repeatedly argue that there is no foreseeability, and thus there should be no duty, because "[i]t is undisputed that [Mr.] Mower was not placed in danger of bodily harm," and there is "a general rule that negligently-caused pure emotional harm is not recoverable even when it is foreseeable."

includes treating therapists who carelessly provide therapy to a minor child patient for potential sex abuse in a manner that injures the nonpatient parent through false allegations or memories of sexual abuse. "And the foreseeability question is whether there are circumstances within that category in which [treating therapists] could foresee injury." *Id.* We conclude there is.

¶ 26 There are undoubtedly circumstances within this category which present highly foreseeable risks, such as a treating therapist using rejected therapeutic methods that create a significant likelihood of implanting false memories of abuse into a minor child's mind or convincing a child to levy false accusations of abuse. "It is indisputable that being labeled a child abuser . . . often results in grave *physical*, emotional, professional, and personal ramifications." *Hungerford v. Jones*, 722 A.2d 478, 480 (N.H. 1998) (emphasis added) (citation omitted) (internal quotation marks omitted). And it's certainly reasonably foreseeable that a parent, upon learning of allegations of sexual abuse committed against his or her child by another person, might become violent and attack the accused or the accused's property. *Cf. United States v. Kupfer*, 68 F. App'x 927, 930 (10th Cir. 2003) (the defendant shot a man that "had allegedly sexually assaulted [the]

---

(Quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47 cmt. i). This argument fundamentally misconstrues the appropriate foreseeability analysis for duty—it is not whether the specific injury a plaintiff suffered was foreseeable or whether that injury would be a compensable harm. The defendants' argument better belongs in the question of breach or damages. *See Jeffs*, 2012 UT 11, ¶ 24.

Our case law does generally require a plaintiff to show that he or she was in the zone of physical danger to recover for negligent infliction of emotional distress cases. *See infra* ¶ 59. And it may be true that if the only harm that is foreseeable from a defendant's negligence—correctly analyzed on the categorical level—is emotional harm, we might conclude that the foreseeability factor in the *Jeffs* test weighs against finding a duty. But the foreseeability question in the duty analysis cannot focus on the harm allegedly suffered by the plaintiff in the case. Instead, it must focus on the category at issue as a whole.

defendant's sister"); *United States v. Lofton*, 776 F.2d 918, 919 (10th Cir. 1985) (the defendant shot her husband while arguing about allegations that he had sexually abused her daughter).[9] Such a reaction in this circumstance is even more foreseeable given the importance of the parent-child relationship and the emotions involved. *Cf. In re K.S.*, 737 P.2d 170, 172 (Utah 1987) ("The parent-child relationship is constitutionally protected, and termination of that relationship is a drastic measure . . . ." (citations omitted)); *In re J.P.*, 648 P.2d 1364, 1373 (Utah 1982) ("[T]he most universal relation in nature . . . [is] that between parent and child." (second alteration in original) (citation omitted)); *In re P.L.L.*, 597 P.2d 886, 889 (Utah 1979) (recognizing "our general reluctance to sever the natural parent-child relationship").[10]

¶ 27 Because this category includes circumstances where a risk of physical injury to nonpatient parents or their property is reasonably foreseeable, the foreseeability factor doesn't weigh against imposing a duty on treating therapists to conduct a minor child's therapy in a manner that "refrain[s] from affirmatively causing injury to nonpatient[]" parents. *Jeffs*, 2012 UT 11, ¶ 28.

2. Who Best Bears the Loss

¶ 28 The next factor requires determining which party is in the best "position to bear the loss occasioned by the injury." *Id.* ¶ 29 (citation omitted) (internal quotation marks omitted). "The parties' relative ability to 'bear the loss' has little or nothing to do with the depth of their pockets." *Id.* Instead, the determination is based on

---

[9] We recognize that the foreseeability of these types of injuries may be speculative, but we find them to be sufficiently foreseeable to prevent this factor from weighing against imposing a duty.

[10] This isn't to say that the therapist will necessarily be the proximate cause of these harms. *Cf. Jeffs*, 2012 UT 11, ¶ 26 ("[W]hether the precise mixture of drugs did foreseeably cause Mr. Ragsdale's outburst is a question of proximate cause, as is whether Mr. Ragsdale's criminal conduct supersedes [the nurse's] conduct as the proximate cause of Ms. Ragsdale's death.").

whether the defendant is best situated to take reasonable precautions to avoid injury. Typically, this factor would cut against the imposition of a duty where a victim or some other third party is in a superior position of knowledge or control to avoid the loss in question. . . . because [the defendant] lacks the capacity that others have to avoid injury by taking reasonable precautions.

*Id.* ¶ 30 (footnotes omitted).

¶ 29 When sexual abuse has actually occurred, the treating therapist isn't in the best position to avoid the potential harms. The third-party abuser is in a better position to avoid the potential harms, namely by not committing the abuse in the first place. But the same cannot be said when memories or allegations of "abuse" emanate from the practices or techniques in the therapy sessions themselves. Because only the therapist has control over the instrumentality that creates the nonexistent "abuse," treating therapists are "in the best position to avoid the harm caused by the introduction of false memories." *Roberts I*, 886 N.W.2d at 472. The therapist "alone is responsible for the methods used in treatment." *Id.* "[T]he patient must trust that the [therapist] will pursue a course of treatment guided by competent professional judgment" and the parents "have a right to expect that a [therapist] will not cause the patient to have false memories of childhood sexual abuse." *Id.* at 472–73 (citation omitted). Thus, this factor doesn't weigh against the imposition of a duty in circumstances (such as those alleged in this case) where the alleged abuse has not in fact occurred. In combination with the policy considerations set forth below, this factor supports limiting a treating therapist's duty to that of not affirmatively giving rise to false memories or false allegations of sexual abuse by the plaintiff parent.

3. General Policy Considerations

¶ 30 Finally, the defendants and their amici raise several general policy arguments to counter the imposition of a duty on treating therapists. These policy considerations must be analyzed against this backdrop:

Concluding that no duty exists means that, "for certain categories of cases, defendants may not be held accountable for damages they carelessly cause,

no matter how unreasonable their conduct." But recognizing a duty does not itself mean that a defendant will incur liability; a plaintiff must still prove the other elements of negligence (breach of the duty, causation, and damages).

*Guerra v. State*, 348 P.3d 423, 429 (Ariz. 2015) (Bales, C.J., dissenting) (citations omitted).

¶ 31 We find the policy considerations raised are insufficient to reject a duty on a broad categorical basis. However, the policy considerations are sufficient to warrant limiting the duty to conducting treatment in a manner that doesn't recklessly give rise to false memories or allegations of childhood sexual abuse.[11] *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 7(b) ("In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification."); *cf. Roberts I*, 886 N.W.2d at 473 (limiting the "duty to ensur[ing] that the professional's treatment does not give rise to false memories of childhood sexual abuse").

¶ 32 The defendants and their amici first raise the social utility of treating and eradicating sexual abuse and allege that a duty would "chill" a therapist's treatment of a minor child's sexual abuse trauma. We recognize the strong social importance of providing children therapy for sexual abuse. *See, e.g.*, *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1170 (Pa. 2000) ("The need for prevention of child abuse is unquestionable, as is the importance of adequate psychological treatment for children who have been sexually abused.") It's this importance and social utility, along with the concerns discussed in paragraph 29, which lead us to

---

[11] Mr. Mower argues that he has a "vested right" in the negligence standard (i.e. reasonable care) announced by *Jeffs* that applied when his claim accrued. We disagree. No case, including *Jeffs*, has announced a duty to the category before us. We wouldn't be taking away a vested right if we concluded that no duty exists in this case. Thus, we can't be taking away a vested right by limiting the duty we first announce in this case.

limit a treating therapist's duty towards nonpatient parents to acting in a manner that refrains from recklessly causing false memories or allegations of childhood sexual abuse by that parent.[12]

¶ 33 But we don't share the concern that any duty to nonpatient parents would impact a therapist's treatment. "[T]o entertain this argument is to accept the facile notion that one will not engage in conduct unless he can do so recklessly and with impunity." *Guerra*, 348 P.2d at 432 (Bales, C.J., dissenting). In reality, "the standard of care by which a therapist's conduct is measured is not heightened." *Hungerford*, 722 A.2d at 481–82. The duty we announce today "will not burden the therapist with a standard of care more onerous than that under which he or she is already required to act in treating his or her patients." *Sawyer v. Midelfort*, 595 N.W.2d 423, 435 (Wis. 1999). As a result, "the therapist's treatment choices need be limited only by the duty of care the therapist owes his or her patient." *Id.*

¶ 34 Moreover, "[t]he requirements of breach and proximate cause . . . counterbalance any improper incentive to withhold

---

[12] After our decision in *Jeffs*, the legislature enacted Utah Code section 78B-3-426. Section 78B-3-426(3) requires nonpatient plaintiffs suing a health care provider for malpractice to establish that "the health care provider's . . . conduct . . . manifests a knowing and reckless indifference toward, and a disregard of, the injury suffered by the nonpatient plaintiff."

This section doesn't apply in this case because it came into effect after Mr. Mower's claim arose. Therefore, the arguments in the briefing regarding whether this statute creates a duty to all nonpatients and whether it allows recovery for pure emotional harm aren't before us, and nothing in this opinion should be read as an interpretation of that statute.

However, while not dispositive of our decision today, we believe that it's important to recognize that the policymaking branch of our government has weighed the public policies at issue and determined that, in the circumstances where the statute applies, a heightened standard is necessary, and a health care provider can only be liable to a nonpatient where his or her "conduct . . . manifests a knowing and reckless indifference." UTAH CODE § 78B-3-426(3).

treatment because they pose significant barriers to plaintiffs in [these] cases." *Cf. Jeffs*, 2012 UT 11, ¶ 35. A therapist shouldn't fear a duty to nonpatient parents because a therapist who doesn't breach that duty won't be held liable. "Even when a [therapist] uses a therapeutic technique that actually causes a patient to have a false memory of sexual abuse," the therapist "would not be liable if a reasonable [therapist] would have employed the technique under the circumstances, notwithstanding the apparent risk." *Roberts I*, 866 N.W.2d at 472.

¶ 35  But we do recognize that treating a minor for potential sexual abuse is a soft science which can be particularly tricky when dealing with very young children. Many jurisdictions have found the concern of a "chilling" effect to be so significant that they have relied upon it to completely reject a duty. *See, e.g.*, *Doe v. McKay*, 700 N.E.2d 1018, 1024–25 (Ill. 1998) ("Hoping to avoid liability to third parties, however, a therapist might instead find it necessary to deviate from the treatment the therapist would normally provide, to the patient's ultimate detriment."); *Zamstein v. Marvasti*, 692 A.2d 781, 789 (Conn. 1997) (Therapists "should not be distracted from their duty by the specter of potential liability to the suspected abuser in the event that their assessment of the child eventually turns out to be incorrect but honest."); *Flanders v. Cooper*, 706 A.2d 589, 591–92 (Me. 1998) ("Although the negligent reporting of sexual abuse is not at issue in this case, there is an inescapable link between the duty to a third party urged by [the plaintiff] and the willingness of a health care professional to pursue a course of treatment that would cause a child to recognize that sexual abuse has occurred." (footnote omitted)). Although we're not convinced that this concern requires us to conclude that no duty exists, we believe that it further supports limiting liability to when a therapist acts recklessly, ensuring that a therapist's concerns over breaching a duty to a nonpatient parent only come into play when the therapist would have significantly violated the standard of care owed to his or her patient.

¶ 36 The defendants and their amici next contend that creating a duty in the category before us would force a therapist to place the interests of third parties above the interests of the child. But this isn't the case. When it comes to false memories or allegations of childhood sexual abuse, the interests of the patient child and the nonpatient parent are aligned. *See Roberts I*, 866

N.W.2d at 468 ("The patient himself or herself is obviously harmed when a mental health professional uses techniques that give rise to false memories of sexual abuse."); *cf. Jeffs*, 2012 UT 11, ¶ 38 ("[T]he patient's welfare encompasses an interest in minimizing a risk of causing harm to third parties."). And the duty we announce could only be breached when those interests are aligned because "the plaintiff would bear the burden of proving by a preponderance of the evidence that the patient's memories [or the allegations] of childhood sexual abuse are actually false." *Roberts I*, 866 N.W.2d at 472.

¶ 37 Next, the defendants and their amici argue that a duty would undermine confidentiality in the therapist-patient relationship and the openness in the relationship. But we already rejected this notion in *Jeffs*:

> The physician-patient privilege and medical privacy statutes are carefully designed to protect confidentiality and patient privacy, and a party concerned about confidentiality in discovery may seek refuge in a protective order. And even if the existing law on physician-patient confidentiality is imperfectly attuned to the concerns implicated in negligent prescription cases filed by nonpatients, the solution is to fine-tune that law, not to categorically foreclose the imposition of a duty.

2012 UT 11, ¶ 37. The same is true of therapist-patient confidentiality. Thus, concerns over confidentiality don't warrant a complete, categorical rejection of a duty.

¶ 38 The defendants and their amici also argue that the inexactness of therapy requires eliminating a duty. This argument falls short. "[T]he complexity of a particular profession does not typically justify the abdication of professional responsibility for negligence." *Jeffs*, 2012 UT 11, ¶ 39. Instead, "complexity of therapy or treatment necessarily is a factor that informs what is found to be the standard of due care in a particular case." *Sawyer*, 595 N.W.2d at 436. And like the court in *Sawyer*, "we do not believe that a therapist should be relieved from liability when his or her treatment is negligent simply because the problem he or she is treating is complex." *Id.*

¶ 39 Finally, the defendants contend that Utah's sexual abuse reporting statute, UTAH CODE § 62A-4a-410, represents a strong

policy against liability, even when the basis of the claims don't arise from a report (or other action covered by the statute).[13] But section 62A-4a-410 doesn't grant wholesale immunity for any report of sexual abuse. Instead, it limits immunity to those acting in "good faith." *Id.* § 62A-4a-410(1). A therapist would be immune under the statute to the extent that a nonpatient parent alleges damages that flow from a good-faith report. But this limited immunity doesn't warrant removing liability for a whole category of the defendants, particularly when the category includes actions not covered by the statute and individuals who are not operating in good faith, but are instead acting recklessly.

¶ 40 Ultimately, we conclude that the public policy considerations don't endorse the wholesale rejection of a duty to nonpatient parents. But the policy considerations do warrant limiting such a duty to refraining from recklessly causing false memories of childhood sexual abuse by the plaintiff parent.

## II. DUTIES AND EMOTIONAL DISTRESS DAMAGES IN NEGLIGENCE CASES

### A. A General Overview of Duties in the Law

¶ 41 The parties disagree on whether a duty under the *Jeffs* framework extends to not causing emotional harm. A duty is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *See B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5, 275 P.3d 228 (quoting *AMS Salt Indus., Inc. v. Magnesium Corp. of Am.*, 942 P.2d 315, 321 (Utah 1997)). This obligation changes according to the relationships of the parties and the legally recognized duties that inhere in their relationships. These duties can be statutorily based or recognized in common law.

¶ 42 "Generally, at common law, one who suffers injury to his person or property because of the negligence of another has a right of action in tort." *Payne ex rel. Payne v. Myers*, 743 P.2d 186, 188 (Utah 1987) (citation omitted); *see also Jeffs*, 2012 UT 11, ¶ 21 ("As a general rule, we all have a duty to exercise care when

_____

[13] As the defendants acknowledge, Mr. Mower's claims don't stem from Ms. Baird reporting potential sexual abuse, as she was required to under the statute. Instead, Mr. Mower's claims are based on malpractice committed during T.M.'s treatment.

engaging in affirmative conduct that creates a risk of physical harm to others." (citations omitted)); *Maack v. Res. Design & Constr., Inc.*, 875 P.2d 570, 580 (Utah Ct. App. 1994) ("A duty to use ordinary care and skill is not imposed in the abstract. It results from a conclusion that an interest entitled to protection will be damaged if such care is not exercised. Traditionally, interests which have been deemed entitled to protection in negligence have been related to *safety* or freedom from physical harm. Thus, where personal injury is threatened, a duty in negligence has been readily found. Property interests also have generally been found to merit protection from physical harm." (quoting *Crowder v. Vandendeale*, 564 S.W.2d 879, 882 (Mo. 1978) (en banc))), *abrogated on other grounds by Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, 221 P.3d 234.

¶ 43   The traditional common law duty is framed as "a duty of reasonable care." *See Williams v. Melby*, 699 P.2d 723, 726 (Utah 1985) (citations omitted). Compliance with that traditional duty is met when the defendant exercises "the care that a reasonable person would undertake in the defendant's circumstances." *Graves v. N. E. Servs., Inc.*, 2015 UT 28, ¶ 37, 345 P.3d 619. The specific scope of the duty will depend upon the conduct that gives rise to the duty and the relationship of the plaintiff and the defendant. *See id.* ¶ 29 ("[The defendant's] affirmative acts are a basis for imposing a duty *in the performance of those acts*, not for a broader duty to undertake additional measures aimed at preventing the sexual assault by a third party."); *Jeffs*, 2012 UT 11, ¶ 17 (The court distinguished a court of appeals case by noting that the court of appeals case "simply indicates that the type of harm the officer suffered—removal from the police force—did not come within the range of harms that the physician had a duty to avoid. That does not mean that the physician lacked a duty to avoid affirmatively causing physical injury to the officer. If the physician in [that case] had used a scalpel instead of a tongue depressor to facilitate a throat examination, presumably the duty would be as obvious as the ensuing injuries."); *id.* ¶ 7 ("Acts of misfeasance . . . typically carry a duty of care" while "[n]onfeasance . . . generally implicates a duty only in cases of special legal relationships." (citation omitted)). The defendant's relationship with a third party may also give rise to a duty of care to the plaintiff. *See Graves*, 2015 UT 28, ¶ 20 ("A person generally has no duty to control the conduct of third persons. This general

rule, of course, is subject to a significant exception—[the] 'special relationship' principle." (citations omitted) (internal quotation marks omitted)).

¶ 44 Our law also recognizes "[l]egal duties" arising from "contractual, fiduciary, and filial relationships." *AMS Salt Indus.*, 942 P.2d at 321; *see also Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*, 2018 UT 4, ¶¶ 52, 56, 417 P.3d 95 (recognizing that fiduciary duties that "give[] rise to a 'particularized and enhanced duty of care'" include fiduciary relationships "such as attorney-client, physician-patient, or insurer-insured" (citations omitted)). Whether a legal duty exists and the scope of that duty depends on "the structure and dynamics of the relationship between the parties."[14] *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 15, 143 P.3d 283; *see also Davencourt at Pilgrims Landing*, 2009 UT 65, ¶ 37 (recognizing a "limited fiduciary duty" because of "the nature of the developer's relationship with the association and its members"). A defendant may also be obligated to conform to specific standards of conduct based upon a statutory duty. *See Dugan v. Jones*, 615 P.2d 1239, 1248 (Utah 1980) ("Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and is answerable at law for breaches of his or her statutory duty to the public."), *superseded on other grounds by rule*, UTAH R. CIV. P. 16(d), *as recognized in Arnold v. Curtis*, 846 P.2d 1307 (Utah 1993).

¶ 45 Duties may give rise to negligence claims or only to specifically recognized causes of action outside of a negligence

---

[14] The attenuation of the relationship is highly relevant to determining whether a legal duty exists. *See Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 16, 143 P.3d 283. We have also identified factors such as "[a]ge, knowledge, influence, bargaining power, sophistication, and cognitive ability" as some of the most "prominent among a multitude of life circumstances that a court may consider in analyzing whether a legal duty is owed by one party to another." *Id.* If the disparity in the "circumstances distorts the balance between the parties in a relationship to the degree that one party is exposed to unreasonable risk, the law may intervene by creating a duty on the advantaged party to conduct itself in a manner that does not reward exploitation of its advantage." *Id.*

claim. *See Gables at Sterling Vill.*, 2018 UT 4, ¶ 56 (differentiating between a breach of fiduciary duty claim and a negligence claim); *Davencourt at Pilgrims Landing*, 2009 UT 65, ¶ 40 (allowing claims for negligence and negligent misrepresentation "insofar as the claims stem from the limited fiduciary duty owed"); *Yazd*, 2006 UT 47, ¶ 18 (holding that a claim for fraudulent concealment was warranted where a builder-contractor assumes a legal duty to homebuyers to communicate material information); *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 800 (Utah 1985) ("[If] the duties and obligations of the parties are contractual rather than fiduciary[, w]ithout more, a breach of those implied or express duties can give rise only to a cause of action in contract, not one in tort."). A duty also exists to refrain from committing intentional torts. *Graves*, 2015 UT 28, ¶ 50 ("[E]veryone has a legal obligation to refrain from committing intentional torts."); *Beck*, 701 P.2d at 800 n.3 ("[T]he law of this state recognizes a duty to refrain from intentionally causing severe emotional distress to others." (citation omitted)).

¶ 46   In a typical negligence claim based on a traditional duty, a plaintiff may not recover absent physical harm to the plaintiff or his or her property. *See supra* ¶ 42. However, in narrow circumstances, when a defendant breaches the traditional duty owed to the plaintiff by placing him or her at risk of actual physical peril, the plaintiff may recover for negligent infliction of emotional distress. *See Hansen v. Sea Ray Boats, Inc.*, 830 P.2d 236, 239–40 (Utah 1992). Although recovery for emotional distress usually requires presence in the zone of danger, *see id.*, the *Restatement (Third) of Torts* now recognizes limited situations where defendants will also owe the plaintiff a limited duty to act with reasonable care when placing one at risk of serious emotional harm. RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47 cmt. g (AM. LAW INST. 2012). The next two subsections flesh out the development of the law with respect to the recovery of emotional distress damages in negligence and negligent infliction of emotional distress cases.

*B. Development of Utah Case Law on Negligent Infliction of Emotional Distress*

¶ 47   Historically, "[i]t [was] well established in Utah that a cause of action for emotional distress [couldn't] be based upon mere negligence." *Reiser v. Lohner*, 641 P.2d 93, 100 (Utah 1982) (citations omitted), *abrogated by Johnson v. Rogers*, 763 P.2d 771

(Utah 1988). *Reiser* based that conclusion on two prior decisions: *Samms v. Eccles*, 358 P.2d 344 (Utah 1961), *abrogated by Johnson v. Rogers*, 763 P.2d 771 (Utah 1988), and *Jeppsen v. Jensen*, 155 P. 429 (Utah 1916). *See Reiser*, 641 P.2d at 100 n.26 (citations omitted).

¶ 48 In 1988, this court decided that, based on the age of *Samms* and *Jeppsen*, "a reexamination of their premises [was] timely." *Johnson*, 763 P.2d at 779. We recognized that "negligent infliction of emotional distress as a separate tort (distinct from the 'willful and wanton' infliction of emotional distress or the negligent infliction of physical injuries with concomitant emotional injuries) ha[d] evolved rapidly." *Id.* (citations omitted). Although courts across the country had adopted different rules, by 1988 "no jurisdiction preclude[d] recovery under any circumstances." *Id. Johnson* analyzed three tests used by other jurisdictions: the impact rule, the zone-of-danger rule (as set forth in section 313 of the *Restatement (Second) of Torts*), and a foreseeability standard (the *Dillon* rule). *Id.* at 780–84.

¶ 49 The majority in *Johnson* recognized a cause of action for negligent infliction of emotional distress in Utah and adopted the zone-of-danger rule found in section 313, but acknowledged that, "[a]t some future date, [the court] may determine that there is merit in some of the other approaches." *Id.* at 785 (Zimmerman, J., concurring in part) (representing a majority on the issues addressed). Then, "we unequivocally adopted the zone of danger rule." *Boucher ex rel. Boucher v. Dixie Med. Ctr.*, 850 P.2d 1179, 1182 (Utah 1992) (citing *Sea Ray Boats*, 830 P.2d at 241).

¶ 50 This court's selection of the zone-of-danger rule "[was] based in part on the notion that allowing recovery to all those who suffer emotional distress because of another's injury has the potential of allowing unlimited recovery." *Id.* at 1182 (citation omitted). We recognized that "[t]he scope of a defendant's duty is limited to injuries that are the foreseeable result of his or her carelessness." *Sea Ray Boats*, 830 P.2d at 241. So, "[t]o place a duty upon a defendant to protect bystanders who are not in danger of bodily injury from purely emotional injury is to allow potentially unlimited recovery." *Id.* We held that "the foreseeability of emotional injury as the only limit on recovery for that injury is speculative at best and creates an unjustified risk for a defendant to bear when he or she has not created a risk of bodily injury to the plaintiff." *Id.* Furthermore, "[t]he approaches that allow recovery for plaintiffs who are not within the zone of danger have

not developed rational limits on liability. Rather, these approaches have led to confusion, inconsistent application, and anomalous results." *Boucher*, 850 P.2d at 1182 (citations omitted).

¶ 51    The zone-of-danger rule, as set out in section 313 of the *Restatement (Second) of Torts*, provides:

> (1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor
>
>> (a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and
>>
>> (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.
>
> (2) The rule stated in Subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.

RESTATEMENT (SECOND) OF TORTS § 313.

¶ 52    Subsection (1) allows "[a] plaintiff who was within the zone of danger" to "recover for emotional distress caused by fear for personal safety even though the plaintiff suffered no physical harm as a result of the defendant's breach of duty." *Sea Ray Boats*, 830 P.2d at 240; *see also id.* at 240 n.13 ("Although a literal reading of subsection (1) does not appear to require that the plaintiff be within the zone of danger in order to obtain recovery if he or she feared personal harm, we believe that the case law interpreting section 313, which requires that the plaintiff be within the zone of danger, is the proper limitation on recovery. Therefore, we require that the plaintiff be within the zone of danger." (citations omitted)); *Boucher*, 850 P.2d at 1181 ("[P]laintiffs who suffer emotional distress because of another's negligence, though they do not suffer any physical impact, [may recover] only if the plaintiffs are placed in actual physical peril and fear for their own safety." (citations omitted)).

22

¶ 53   Recovery is typically prohibited under subsection (1) for emotional distress damages arising from the "knowledge of the harm or peril to a third person." RESTATEMENT (SECOND) OF TORTS § 313(1)(a). However, under subsection (2), a plaintiff may "recover for emotional distress caused by witnessing injury to others" in the same manner as under subsection (1) when the plaintiff is "within the zone of danger created by the defendant's breach of duty." *Sea Ray Boats*, 830 P.2d at 240 (citation omitted).

¶ 54   Thus, presence in the zone of danger serves as a major limitation to recovery for negligent infliction of emotional distress under our case law. But presence in the zone of danger isn't the only limitation to recovery for negligent infliction of emotional distress. Under section 313, a plaintiff can only recover for the "resulting illness or bodily harm." RESTATEMENT (SECOND) OF TORTS § 313.

¶ 55   In *Hansen v. Mountain Fuel Supply Co.*, we were asked to determine "whether a plaintiff seeking recovery for [negligent infliction of emotional distress] must demonstrate that the emotional distress ha[d] manifested itself in physical symptoms." 858 P.2d 970, 973 (Utah 1993). The majority of the court decided not to reach the issue, determining that even if mental illness, in the absence of physical manifestation, was sufficient, the plaintiffs in the case had not met that standard. *Id.* at 982 (Zimmerman, J., concurring in part and concurring in the result) (representing a majority of the court).

¶ 56   We were again presented with this question in *Harnicher v. University of Utah Medical Center*, 962 P.2d 67 (Utah 1998). In *Harnicher*, we determined that "severe emotional distress can cause mental illness and that genuine mental illness constitutes real harm." *Id.* at 71. But we declined to determine whether "'diagnosed mental illness,' standing alone, is sufficient to support a claim for negligent infliction of emotional distress." *Id.* And, we further limited recovery by concluding that "practicality demands that the standard of proof in such cases be more than merely subjective." *Id.* (citation omitted).

¶ 57   We also noted that "the emotional distress suffered must be severe; it must be such that 'a reasonable [person,] normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'" *Id.* at 70 (alteration in original) (quoting *Mountain Fuel*, 858 P.2d at 975). We found "[s]uch a threshold test [to be] particularly

necessary because the existence of and cause of a mental illness often is not obvious in a manner comparable to a physical injury or illness." *Id.* at 72. Since *Harnicher*, we have continued to require a plaintiff to "prove [emotional] distress by means of severe physical or mental manifestations." *Carlton v. Brown*, 2014 UT 6, ¶ 57, 323 P.3d 571 (citation omitted).

¶ 58 We have similarly held fast in our zone-of-danger requirement. We adopted the zone-of-danger rule in part because the "limitations seem[ed] to strike a fair balance between the interests those injured have in recovering damages and the interests of the courts and the public in predictable rules." *Johnson*, 763 P.2d at 785 (Zimmerman, J., concurring in part) (expressing a majority opinion on the issue). We have also emphasized that the zone-of-danger rule "comports with the basic tort principle that a person may not recover for vicarious injuries." *Sea Ray Boats*, 830 P.2d at 241 (citations omitted). We have frequently been presented with the opportunity to reconsider our requirements, but have declined to do so based on the rationale behind the rule. *See, e.g.*, *id.* at 242 (rejecting the *Dillon* framework for bystander recovery based on foreseeability and holding that a plaintiff "who feared for her own safety but was not objectively within the zone of danger created by the defendants' breach of duty[] may not recover for emotional distress caused by her fright"); *Boucher*, 850 P.2d at 1182 (declining to adopt modifications of the *Dillon* rule and noting that our court had "unequivocally . . . rejected any approach that allows plaintiffs who are not within the zone of danger to recover for emotional distress caused by witnessing another's injury" (citation omitted)); *Straub v. Fisher & Paykel Health Care*, 1999 UT 102, ¶¶ 9, 14, 990 P.2d 384 (distinguishing "between direct victims, those who are in actual physical peril, and bystanders, those who may witness or be affected by the actions, but who themselves suffer no actual physical peril" and prohibiting recovery "unless the plaintiff is a direct victim of the defendant's negligence" (citation omitted)).

¶ 59 Throughout these cases, we have highlighted three main policy concerns that have shaped our law. First, our case law reflects the need to ensure the genuineness of claims, both in their existence and in causation. *See, e.g.*, *Harnicher*, 962 P.2d at 72 (A threshold severity test is necessary because "the existence of and cause of a mental illness often is not obvious in a manner comparable to a physical injury or illness."). Second, there must

be reasonable limitations on recovery, both in terms of the potential class of victims and the severity of the harm required. *See, e.g.*, *Sea Ray Boats*, 830 P.2d at 241 ("To place a duty upon a defendant to protect bystanders who are not in danger of bodily injury from purely emotional injury is to allow potentially unlimited recovery. . . . [T]he foreseeability of emotional injury as the only limit on recovery for that injury is speculative at best and creates an unjustified risk for a defendant to bear when he or she has not created a risk of bodily injury to the plaintiff."); *Harnicher*, 962 P.2d at 71–72 (requiring the emotional distress suffered to be "severe"). Finally, plaintiffs should only be allowed to recover for a breach of a duty owed to them and shouldn't be allowed to recover vicariously for a breach of a duty owed another. *See, e.g.*, *Sea Ray Boats*, 830 P.2d at 240–41 ("The zone of danger rule complements the basic requirement that persons exercise reasonable care to protect others from injury. Those who breach their basic duty of care to others will be required to compensate those who are injured, even when the injuries are not caused by direct impact, but by the operation of foreseeable emotional distress. Those plaintiffs to whom a defendant has not breached the duty of care will be denied recovery, even if they are bystanders who witness the injury of another to whom the defendant has breached the duty."); *id.* at 241 ("A plaintiff may only sue in his own right for a wrong personal to him, and not as the vicarious beneficiary of a breach of duty to another." (citation omitted)); *Straub*, 1999 UT 102, ¶ 15 (refusing to allow recovery "for emotional distress arising from a situation in which [the defendants] did not breach a duty of care owed to [the plaintiff]" (citation omitted)).

*C. Development of Emotional Distress Damages Around the Country*

¶ 60   As our negligent infliction of emotional distress case law evolved, we considered the evolution of negligent infliction of emotional distress claims around the country to guide our case law. *See Johnson*, 763 P.2d at 779 ("Virtually all jurisdictions in the United States now recognize a broad protected interest in mental tranquility . . . . The negligent infliction of emotional distress as a separate tort . . . has evolved rapidly only since the 1960s." (citation omitted)). In *Johnson*, for example, we recognized that no "jurisdiction in the United States . . . bars all recovery for the negligent infliction of emotional distress." *Id.* at 782. Instead, "[t]he policy considerations in favor of realistic limits on

negligence liability ha[d] given rise . . . to the impact rule, the zone-of-danger rule, and the *Dillon* rule." *Id.* After considering the benefits and drawbacks of these rules, *id.* at 779–82, we selected the zone-of-danger rule to govern our negligent infliction of emotional distress cases, *id.* at 785 (Zimmerman, J., concurring in part) (representing a majority on the point).

¶ 61 Similarly, in considering a bystander recovery theory, we looked at the bystander rules that applied in other courts. *See Sea Ray Boats*, 830 P.2d at 242 (considering the bystander rule adopted by the California Supreme Court in *Dillon* (citation omitted)); *Straub*, 1999 UT 102, ¶¶ 11–14 (rejecting cases that were "factually dissimilar to the bystander scenario" and treated plaintiffs as "direct victims" even though not placed in actual physical peril (citations omitted)). And while we recognized that "many states have adopted *Dillon*'s rules as a framework for recovery in emotional distress cases," we rejected this rule as "artificial and unworkable" and highlighted that the rule "is not based on any breach of a defendant's duty to a plaintiff, but is based on vicarious recovery for the breach of a duty to another." *Sea Ray Boats*, 830 P.2d at 242.

¶ 62 Although we haven't had a significant opportunity to revisit this area, negligent infliction of emotional distress case law around the country has continued to evolve. This evolution is best recognized by the 2012 publication of the *Restatement (Third) of Torts: Liability for Physical and Emotional Harm*. Sections 47 and 48 are particularly relevant to following trends in negligent infliction of emotional distress cases.

¶ 63 Despite the evolution in the law, we note that the basic tenet behind emotional distress damages still holds true: the "general rule [is] that negligently caused pure emotional harm is not recoverable even when it is foreseeable." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47 cmt. i. Sections 47 and 48 act as exceptions to this general rule. *Id.*

¶ 64 *Restatement (Third)* section 47(a) adopts a zone-of-danger test similar to that which we have adopted under *Restatement*

*(Second)* section 313(1).[15] *Compare* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47(a) *with* RESTATEMENT (SECOND) OF TORTS § 313(1). *See also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47 cmt. e (referring to the rule in 47(a) as the "zone-of-danger requirement"). However, the *Restatement (Third)* and several courts across the country have expanded liability for emotional damages even when a plaintiff was never personally placed in physical danger.

¶ 65 The first expansion is the bystander rule adopted in *Restatement (Third)* section 48—an expansion of the rule we adopted in *Restatement (Second)* section 313(2). *See Sea Ray Boats*, 830 P.2d at 240 (citation omitted) Under *Restatement (Third)* section 48, a plaintiff may recover for serious emotional harm caused by witnessing a close family member suffer serious bodily injury at the hands of the defendant, as long as the plaintiff "perceive[d] the event contemporaneously," even if the plaintiff was outside of the zone of danger. RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 48 & cmt. a. This section is based on the rule adopted in *Dillon v. Legg*, 441 P.2d 912 (Cal. 1968) (in bank). *See id.* § 48 cmt. a.

¶ 66 Since *Dillon* was decided, even the California Supreme Court found it to be unworkable. *See Thing v. La Chusa*, 771 P.2d 814, 826 (Cal. 1989) (in bank) ("The *Dillon* experience confirms . . . that [f]oreseeability proves too much. . . . Although [foreseeability] may set tolerable limits for most types of physical harm, it provides virtually no limit on liability for nonphysical harm." (second and third alterations in original) (citation omitted) (internal quotation marks omitted)). As the *Restatement (Third)* recognizes, twenty-nine "jurisdictions now follow *Dillon* or a modified version of the *Dillon* approach" while eleven

---

[15] We note that one major difference is that *Restatement (Third)* section 47 requires the conduct to "cause[] serious emotional harm" instead of "severe" emotional harm. *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47; *id.* § 47 cmt. j (explaining the differences between "serious" and "severe" emotional harm). Our case law requires a plaintiff to establish "severe" emotional distress. *Harnicher*, 962 P.2d at 72 (quoting *Mountain Fuel*, 858 P.2d at 975).

jurisdictions (including Utah) "permit bystander recovery only when the plaintiff is in the 'zone of danger.'" RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 48 reporter's notes cmt. a (citations omitted).

¶ 67 We have previously considered, and rejected, this bystander rule. As the *Restatement (Third)* notes, a bystander's claim "is derivative of the physically injured person's tort claim against the tortfeasor." *Id.* § 48 cmt. d. But, under Utah law, "[a] plaintiff may only sue in his own right for a wrong personal to him, and not as the vicarious beneficiary of a breach of duty to another." *Sea Ray Boats*, 830 P.2d at 241 (citations omitted).

¶ 68 The second example of this expansion, and the portion of the *Restatement (Third)* most relevant to our analysis today, is section 47(b). Under section 47(b), a plaintiff can recover for serious emotional harm if the harm "occurs in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm." *Id.* § 47.

¶ 69 *Restatement (Third)* section 47(b) stems from cases around the country that recognized certain circumstances where a plaintiff should be allowed to recover for negligently inflicted emotional distress even when "the defendant [hasn't] created a risk of bodily harm to the plaintiff." *Id.* § 47 cmt. f. Section 47(b) recognizes that some parties have a limited duty to exercise reasonable care when placing another at risk of serious emotional harm when engaged in certain conduct. *Id.* § 47 cmt. g.

¶ 70 Courts originally recognized two types of cases that served as a predicate for the rule under section 47(b): "(1) delivering a telegram or other communication erroneously announcing death or illness; and (2) mishandling a corpse or bodily remains." *Id.* § 47 cmt. f. Courts around the country have expanded liability beyond those two types of cases, permitting recovery for claims such as

> a physician negligently diagnos[ing] a patient with a dreaded or serious disease; a physician negligently caus[ing] the loss of a fetus; a hospital los[ing] a newborn infant; a person injur[ing] a fetus; a hospital (or another) expos[ing] a patient to HIV infection; an employer mistreat[ing] an employee; or a spouse mentally abus[ing] the other spouse.

*Id.*

¶ 71   Different courts have since adopted different tests and parameters. Some courts have adopted an independent duty rule that "allow[s] recovery where the claimant establishes the breach of some independent duty." *Larsen v. Banner Health Sys.*, 81 P.3d 196, 202 (Wyo. 2003) (citations omitted). This rule allows recovery for emotional distress damages that aren't accompanied by physical injury "where the nature of the relationship between the parties is such that there arises a duty to exercise ordinary care to avoid causing emotional harm." *Lawrence v. Grinde*, 534 N.W.2d 414, 421 (Iowa 1995) (citations omitted). Similarly, Alaska "recognizes a 'preexisting duty exception' . . . . [where] a plaintiff may recover when the parties stand in a contractual or fiduciary relationship and the nature of this relationship imposes a duty that would foreseeably result in emotional harm to the plaintiff." *Larsen*, 81 P.3d at 203 (quoting *Kailstrom v. United States*, 43 P.3d 162, 166 (Alaska 2002)).

¶ 72   At times, this duty is rooted in a contractual relationship. *See, e.g.*, *id.* at 206 ("[I]n Wyoming, in the limited circumstances where a contractual relationship exists for services that carry with them deeply emotional responses in the event of breach, there arises a duty to exercise ordinary care to avoid causing emotional harm."). At other times, the duty is rooted in a special relationship between the parties. *See, e.g.*, *Doe Parents No. 1 v. State, Dep't of Educ.*, 58 P.3d 545, 582–90 (Haw. 2002) (concluding that, based on a "special relationship" between the school and the parents, a school owed a duty of care to parents of children to protect the children from sexual abuse at school and holding the school liable for the parents' emotional distress damages that resulted from the child being sexually abused).

¶ 73   Since the *Restatement (Third)* was adopted, many courts have considered or accepted section 47(b) and established tests to determine when it has been satisfied. *See, e.g.*, *Guerra v. State*, 348 P.3d 423, 428–433 (Ariz. 2015) (Bales, C.J., dissenting); *Miranda v. Said*, 836 N.W.2d 8, 28–30 (Iowa 2013); *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 817–19 (D.C. 2011) In *Hedgepeth*, the court highlighted two determinative factors required for a duty to exist under a draft version of section 47(b): "(1) a relationship or undertaking to the plaintiff that necessarily implicates the plaintiff's emotional well-being, and (2) the special likelihood that the defendant's negligence in the course of performing obligations

pursuant to such relationship or undertaking will result in emotional distress." 22 A.3d at 815. Based on these factors, the court concluded that a clinic had a duty to the plaintiff to not misdiagnose the plaintiff as HIV-positive. *Id.* at 820.

¶ 74 In *Miranda*, 836 N.W.2d 8, Iowa also considered what test was appropriate for section 47(b). The court noted that "the existence of a duty of care to protect against emotional harm in negligence claims will turn on the nature of the relationship between the parties, as well as the nature of the transaction or arrangement responsible for creating the relationship." *Miranda*, 836 N.W.2d at 28. And in determining if the relationship is one where "negligent conduct is especially likely to cause severe emotional distress, [the Iowa Supreme Court] ha[s] primarily considered any remoteness between the negligent conduct and the harm to the plaintiff." *Id.* at 30 (citations omitted). Moreover, conduct is "especially likely to cause severe emotional distress when the conduct [i]s specifically directed at the plaintiff." *Id.* (citation omitted).

¶ 75 Although different courts have adopted different approaches, the *Restatement (Third)* gives three suggested boundaries. First, "foreseeability cannot appropriately be employed as the standard to limit liability for emotional harm." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47 cmt. i. Second, "the policy issues surrounding specific categories of undertakings, activities, and relationships must be examined to determine whether they merit inclusion among the exceptions to the general rule of no liability." *Id.* Finally, "[t]he more general protection for emotional harm contained in [section 47] should not be used to dilute or modify the requirements of those torts" that "protect specific aspects of emotional tranquility," such as "defamation, invasion of privacy, false imprisonment, and malicious prosecution." *Id.* § 47 cmt. o.

## III. A LIMITED DUTY TO REFRAIN FROM INFLICTING SEVERE EMOTIONAL DISTRESS OUTSIDE OF ZONE-OF-DANGER CASES

¶ 76 Based on the evolution of the law around the country, as well as the policy considerations at play, we believe that it's time to expand our recovery for negligent infliction of emotional distress in very limited circumstances. Specifically, we believe that there are certain types of relationships, activities, and undertakings that go to the core of another person's emotional

well-being and security. Individuals who are engaged in such a relationship, activity, or undertaking have a duty to refrain from causing the other person severe emotional distress.

¶ 77   However, we're not prepared today to adopt *Restatement (Third)* section 47(b) wholesale. *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47(b) (AM. LAW INST. 2012). The rule we announce today deviates from section 47(b) in two key ways. First, we retain our "severe" emotional distress requirement—our limited adoption of section 47(b) does not include reducing this requirement to "serious" emotional distress. Second, we're not prepared to announce a duty to refrain from causing severe emotional distress when there wouldn't otherwise be a traditional duty of reasonable care.

¶ 78   This new, limited emotional distress duty analysis should still be completed in the same manner as a traditional duty analysis—on a categorical level. Therefore, in order to establish that a class of defendants would owe a limited emotional distress duty to a class of plaintiffs, the following two-step analysis is required: (1) Does the defendant owe a traditional duty of reasonable care to the plaintiff?; and (2) Is the relationship, activity, or undertaking of the type that warrants a special, limited duty to refrain from causing severe emotional distress?

¶ 79   The first step—the traditional duty analysis—follows the five-factor test we established in *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5, 275 P.3d 228. If such a traditional duty exists, then the second step is to analyze whether a special, limited duty to refrain from causing severe emotional distress is supported.

¶ 80   The second step itself requires a three-prong analysis: (1) Does the relationship, activity, or undertaking "necessarily implicate[] the plaintiff's emotional well-being?" *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810 (D.C. 2011); (2) Is there "an especially likely risk" "that the defendant's negligence in the course of performing obligations pursuant to such relationship[, activity,] or undertaking will result in [severe] emotional distress?" *Id.* at 810–11, 815; and (3) Do general public policy considerations warrant rejecting a limited emotional distress duty where prongs one and two would otherwise find one to exist? *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47 cmt. d ("[A] court may decide that an identified and articulated policy is weighty enough to require the

withdrawal of liability."). All three prongs must be satisfied for a duty to refrain from causing severe emotional distress to exist.[16]

¶ 81   The first prong of this test ensures that the relationship, activity, or undertaking is one that's "fraught with the risk of emotional harm" to the plaintiff.[17] *Vincent v. DeVries*, 72 A.3d 886, 893 (Vt. 2013) (citations omitted). This prong can be met only in those very limited "situations where the emotional well-being of others is at the core of, or is necessarily implicated by, the [relationship, activity, or] undertaking." *Hedgepeth*, 22 A.3d at 814. It isn't possible, nor would it be appropriate, for us to catalog all relationships, activities, or undertakings that would meet this requirement. *Id.* at 812. Instead, the analysis will have to be done on a case-by-case basis, *id.*, with the recognition that very few relationships, activities, or undertakings can meet this high threshold.[18]

---

[16] In this case, we're only being asked to determine whether a limited emotional distress duty should exist in the context of affirmative acts. We leave open the questions of whether a limited emotional distress duty could ever exist for omissions, and, if so, whether our special legal relationship requirement for omissions applies.

[17] The relationships at issue in this analysis are different than the "special legal relationships" addressed by the omissions prong in *Jeffs*, 2012 UT 11, ¶¶ 6-9. *Cf. Roberts I*, 866 N.W.2d at 470 n.6 ("The cases involving the duty to act for another's benefit as a result of a special relationship are, therefore, inapposite." (citation omitted)). Thus, the existence of a "special legal relationship" alone, without a showing that the relationship necessarily implicates a plaintiff's emotional well-being, won't satisfy the first prong of this test.

[18] At first blush, it may seem this test is inconsistent with our decision in *Straub v. Fisher & Paykel Health Care*, 1999 UT 102, 990 P.2d 384. It isn't. In *Straub*, we rejected a nurse's argument that she was a direct victim of a product manufacturer's breach of a duty owed to her because she was operating the equipment that caused a patient's death. *Id.* ¶¶ 12, 15. Instead, we upheld our rule that a plaintiff must be in the zone of danger or the defendant has "not breach[ed] a duty of care owed to [the plaintiff]." *Id.* ¶ 15. We

¶ 82 The second prong of this test recognizes that "the imposition of a duty of care is not predicated on the existence of a highly emotional relationship alone." *Miranda v. Said*, 836 N.W.2d 8, 29 (Iowa 2013) (citation omitted). "Not all negligence is very likely to cause severe emotional distress, and a duty of care to protect against emotional harm does not arise unless negligence is [especially] likely to cause severe emotional distress." *Id.* at 30 (citations omitted). It's necessary "that it [be] not only foreseeable, but especially likely, that the defendant's negligence will cause [severe] emotional distress to the plaintiff." *See Hedgepeth*, 22 A.3d at 800. "[R]emoteness between acts of negligence and the plaintiff [will] militate[] against a duty of care by making the emotional harm less likely to result from the relationship." *Miranda*, 836 N.W.2d at 30.

¶ 83 An objective standard must be used in considering whether there's an "especially likely risk" of negligence causing emotional distress. *Hedgepeth*, 22 A.3d at 810–11 ("The likelihood that the plaintiff would suffer serious emotional distress is measured against an objective standard . . . ."). To recover, a plaintiff must also establish that he or she did actually suffer severe emotional distress that "manifested itself through severe mental or physical symptoms." *Carlton v. Brown*, 2014 UT 6, ¶ 58, 323 P.3d 571; *see also supra* ¶ 77 (maintaining the severe emotional distress requirement); *Harnicher v. Univ. of Utah Med. Ctr.*, 962 P.2d

---

noted that "the manufacturer cannot reasonably foresee the extent to which persons who operate or administer these devices will suffer emotional distress upon witnessing injury to patients when they are not themselves placed at risk of injury." *Id.*

The limited emotional distress duty test we announce today is readily distinguishable from our holding in *Straub* and in no way undercuts the rule we adopted in that case. Although there may be limited exceptions, generally the relationship between product manufacturer and product user doesn't necessarily implicate the emotional well-being of the product user. It's only when the relationship itself necessarily implicates the plaintiff's emotional well-being that a defendant may reasonably foresee the extent to which a plaintiff will suffer emotional distress. The structure of our limited emotional distress duty test ensures that this will be the case before any duty arises.

67, 71–72 (Utah 1998) (requiring objective proof of severe emotional distress).

¶ 84 Finally, the third prong of the test recognizes that, as with traditional duties, public policy may weigh against recognizing a limited emotional distress duty. *See Hedgepeth*, 22 A.3d at 817–18; RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47 cmt. d; *cf. Jeffs*, 2012 UT 11, ¶ 32. These policy considerations should closely mirror those in a traditional duty analysis. But special attention should be given to public policy concerns that would be specially implicated by a limited emotional distress duty, including the three main principles our court has relied upon in deciding negligent infliction of emotional distress cases, *see supra* ¶ 59.

¶ 85 In very narrow circumstances, the limited emotional distress duty test we announce today extends liability for negligent infliction of emotional distress beyond the zone-of-danger test we generally employ. But this limited emotional distress duty doesn't replace or otherwise diminish our zone-of-danger requirements for recovery under that theory. Instead, we merely recognize that, "in addition to permitting recovery based on the 'zone of physical danger' rule," the law allows for recovery based on a defendant's duty to refrain from affirmatively causing a plaintiff severe emotional distress while engaging in certain relationships, activities, or undertakings. *Hedgepeth*, 22 A.3d at 800.

¶ 86 This limited emotional distress duty shouldn't be viewed as an expansive mechanism for recovery. Any duty created under this analysis is limited to a duty to refrain from causing severe emotional distress. And, if a defendant breaches that duty, a defendant will only be liable for damages for the severe emotional harm that "manifest[s] itself through severe mental or physical symptoms." *Carlton*, 2014 UT 6, ¶ 58. This duty "should not be used to dilute or modify the requirements of" other torts that "protect specific aspects of emotional tranquility." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47 cmt. o; *see also id.* ch. 8, scope note (*Restatement (Third)* sections 46–48 don't cover liability for "[o]ther tort claims, such as assault, invasion of privacy, and interference with consortium [that] protect distinct aspects of the interest in emotional tranquility."); *id.* § 46 cmt. m. ("Protection of the parents' interest in their relationship with their child, i.e.,

consortium, is not addressed in this Chapter or Restatement." (citation omitted)).

¶ 87 As discussed in Part II.B above, we have acknowledged three main principles that have guided our court in determining when recovery is appropriate for negligent infliction of emotional distress: (1) "the need to ensure the genuineness of claims, both in their existence and in causation;" (2) the importance of "reasonable limitations on recovery, both in terms of the potential class of victims and the severity of the harm required;" and (3) the requirement that plaintiffs "only be allowed to recover for a breach of a duty owed to them." *Supra* ¶ 59. The new limited emotional distress duty three-prong test we adopt, *see supra* ¶ 80, fits within these principles and each individual limited emotional distress duty analysis can further ensure compliance.

¶ 88 First, we ensure the genuineness of claims in the same way as zone-of-danger cases by requiring similar proof—objective evidence that the plaintiff has suffered severe emotional distress. *See Carlton*, 2014 UT 6, ¶ 57 (requiring a plaintiff to "prove [emotional] distress by means of severe physical or mental manifestations" (citation omitted)); *Harnicher*, 962 P.2d at 71–72 (noting that "practicality demands that the standard of proof in such cases be more than merely subjective" and providing that the "emotional distress suffered must be severe" based on a reasonable person standard (citations omitted)). The first two prongs of our test also support genuineness by limiting the duty to those relationships, activities, or undertakings that impact a person's core emotional well-being and where there's an especially likely risk that negligence would cause severe emotional distress.

¶ 89 Second, a limited emotional distress duty provides reasonable limitations on recovery. A main policy concern with bystander recovery is that "[a] defendant has no way of knowing the number and proximity of bystanders to any given accident caused by his or her negligence." *Hansen v. Sea Ray Boats, Inc.*, 830 P.2d 236, 242 (Utah 1992). And a defendant lacks the techniques to "determin[e] or foresee[] what types of events might cause emotional injury to potential plaintiffs near an accident scene." *Id.* at 241. Our first prong ensures that a duty only extends to a plaintiff in relationships, activities, or undertakings where a plaintiff's emotional well-being is implicated at the core of such conduct. *See Hedgepeth*, 22 A.3d at 812 (This rule "contains a

self-limiting principle based on the nature of the defendant's relationship with, or undertaking to, the plaintiff."). The second prong guarantees that a limited emotional distress duty will only exist where it's not only foreseeable, but also especially likely, that the defendant's negligence will cause the plaintiff severe emotional distress. And recovery will still only be allowed for objectively verifiable severe emotional distress.

¶ 90  Finally, a limited emotional distress duty only allows plaintiffs to recover for a harm that's personal to them and doesn't allow for vicarious recovery. The limited emotional distress duty analysis is centered on the category of plaintiffs. The first prong requires an analysis of whether a category of defendants—engaged in the specific relationship, activity, or undertaking at issue—owe a duty to plaintiffs whose emotional well-being is necessarily implicated by the defendants' conduct. When such a duty arises, the duty is owed to the plaintiff, not to a third party. And it must be the duty owed directly to the plaintiff that's breached.

## IV. ADOPTING A LIMITED DUTY TO REFRAIN FROM RECKLESSLY INFLICTING SEVERE EMOTIONAL DISTRESS ON A MINOR CHILD'S NONPATIENT PARENTS BY GIVING RISE TO FALSE MEMORIES OR ALLEGATIONS OF CHILDHOOD SEXUAL ABUSE BY THE PARENT

¶ 91  Because we have determined that treating therapists owe a limited traditional duty, *see supra* ¶ 40, we must next determine whether treating a nonpatient parent's child for potential sexual abuse by that parent is a type of relationship, activity, or undertaking that warrants a duty to refrain from causing severe emotional distress. As set out above, this determination requires a three-prong analysis:

> (1) Does the relationship, activity, or undertaking "necessarily implicate the plaintiff's emotional well-being?"; (2) Is there "an especially likely risk" "that the defendant's negligence in the course of performing obligations pursuant to such relationship[, activity,] or undertaking will result in [severe] emotional distress?"; and (3) Do general public policy considerations warrant rejecting a limited emotional distress duty where prongs one and two would otherwise find one to exist?

36

*Supra* ¶ 80 (alterations in original) (first quoting *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810–11, 815 (D.C. 2011); then citing RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 47 cmt. d (AM. LAW INST. 2012).

¶ 92   Based on the results of this three-prong test, we conclude that a limited emotional distress duty exists to refrain from recklessly inflicting emotional distress by causing false memories or fabricated accusations of sexual abuse committed by the nonpatient parent.

## A. Necessarily Implicates Emotional Well-Being

¶ 93   The first issue that we must decide is whether a treating therapist's counseling of a minor child for potential sexual abuse constitutes a relationship, activity, or undertaking that necessarily implicates the nonpatient parent's emotional well-being.

¶ 94   Our research hasn't turned up any cases that answer this question when engaging in a purely emotional duty analysis. But many courts have found that a treating therapist owes a duty to nonpatient parents, recognizing that a child's parent "is not a 'third party' in the accepted sense." *Webb v. Neuroeducation Inc., P.C.*, 88 P.3d 417, 423 (Wash. Ct. App. 2004) (citation omitted); *see also Roberts I*, 866 N.W.2d at 469 ("The parent-child relationship is so fundamental to human relations that a parent cannot be equated with a third party in the ordinary sense." (citation omitted)); *supra* ¶ 26 (discussing the importance of the parent-child relationship).

¶ 95   "A diagnosis does not by itself implicate any particular person as the perpetrator of the abuse." *Roberts I*, 866 N.W.2d at 469. But, after a determination has been made "that sexual abuse [did] in fact occur[], . . . a course of action is thereafter embarked upon by the [therapist] [that] is intended to, *and necessarily does*, affect both the child and his or her abuser, especially where a family relationship is involved." *Caryl S. v. Child & Adolescent Treatment Servs., Inc.*, 614 N.Y.S.2d 661, 666 (N.Y. Sup. Ct. 1994) (emphasis added). And, importantly, "a patient's parents are within the class of persons most likely to be implicated by the creation of a false memory." *Roberts I*, 866 N.W.2d at 469.

¶ 96   We agree with these courts. When a therapist is treating a child for potential sexual abuse, the patient's parents are not truly a third party in a traditional sense. The treating therapist "has a substantial connection to the persons most likely to be

harmed by the implantation of the false memory: the patient's parents." *Roberts I*, 866 N.W.2d at 469 (citation omitted). Moreover, the therapist is also engaging in a potentially reckless activity: "elect[ing] to treat a patient using techniques that might give rise to false memories in the patient." *Id.*

¶ 97 This activity and limited relationship between nonpatient parent and therapist necessarily implicates the parent's emotional well-being. Allegations of sexual abuse by a parent "strike[] at the core of a parent's basic emotional security." *Id.* (citation omitted). But, this activity and limited relationship should only give rise to a likewise limited duty. *See id.* at 473. Thus, even though we conclude below that the second and third prongs of our test have been satisfied, we believe that the duty should be limited to refraining from causing false memories or fabricated allegations of sexual abuse committed by the plaintiff nonpatient parent. *Cf. id.* at 473.

¶ 98   Because both the activity and limited relationship each necessarily implicates the parent's emotional well-being, the first prong has been satisfied in the analysis of whether a duty exists to refrain from carelessly inflicting severe emotional distress by causing false memories or fabricated accusations of sexual abuse committed by the nonpatient parent.

### B. Especially Likely That Negligence Would Cause Severe Emotional Distress

¶ 99  Next we must determine, using an objective standard, whether it is especially likely that a therapist's negligence would cause severe emotional distress. *See supra* ¶¶ 82–83. Because we limited our analysis in the first prong solely to refraining from giving rise to false memories or fabricated allegations of sexual abuse, our analysis in this prong will focus on whether the breach of that limited duty would be especially likely to cause severe emotional distress to the nonpatient parent.[19]

---

[19] Situations where there's solely a misdiagnosis of sexual abuse (without implicating the nonpatient parent) would not fall under this category. *See Roberts I*, 866 N.W.2d at 469 ("In the absence of evidence that the professional contributed to or caused the formation of a false memory or otherwise encouraged the patient to falsely implicate his or her parents, the mere diagnosis

¶ 100 A patient's parents are the people most often accused when there are implanted memories of sexual abuse in children. *Roberts I*, 866 N.W.2d at 469. In cases where a parent is falsely accused of sexual abuse, it is especially likely, if not practically inevitable, that the parent will suffer severe emotional distress. "'Discovery' of past sexual abuse necessarily entails the probable destruction of the patient's relationship with that parent." *Trear v. Sills*, 82 Cal. Rptr. 2d 281, 288 (Cal Ct. App. 1999). What's more, "[i]t is generally foreseeable that emotional distress would accompany the prolonged separation of a parent and child." *Miranda v. Said*, 836 N.W.2d 8, 32 (Iowa 2013) (citations omitted).[20]

¶ 101 Moreover, "[i]t is indisputable that being labeled a child abuser [is] one of the most loathsome labels in society and *most often* results in grave physical, *emotional*, professional, and personal ramifications." *Hungerford v. Jones*, 722 A.2d 478, 480 (N.H. 1998) (second alteration in original) (emphases added) (citation omitted) (internal quotation marks omitted). "[T]hose accused of sexual assault feel the pain and stigma associated with the accusations." *Sawyer v. Midelfort*, 595 N.W.2d 423, 431 (Wis. 1999) (citation omitted). "It takes very little imagination to recognize the damning horror that must ensue to a parent *falsely* accused of child molestation." *Trear*, 82 Cal. Rptr. 2d at 285 (citation omitted). It's especially likely that the falsely accused parent will suffer severe emotional distress as a result of these social consequences.

---

of childhood sexual abuse as the underlying cause of a mental disorder does not result in a direct foreseeable harm to the patient's parents.")

[20] This limited emotional distress duty won't give rise to damages for loss of consortium. *See* UTAH CODE § 30-2-11 (allowing loss of consortium claim for spouse but requiring specific injuries to a spouse and noting that loss of consortium is a derivative claim); *Benda v. Roman Catholic Bishop of Salt Lake City*, 2016 UT 37, ¶ 20, 384 P.3d 207 (recognizing a loss of consortium claim for minor child but requiring the same injury threshold as Utah Code section 30-2-11 and noting that the claim is a derivative claim). But severe emotional distress that arises from the separation of the parent and child is compensable. *Supra* ¶ 86.

¶ 102 Overall, it's especially likely that a therapist's negligence, resulting in a minor child having false memories of sexual abuse by the parent, will cause severe emotional distress in the parent. Therefore, the second prong in the analysis of whether a duty exists to refrain from carelessly inflicting severe emotional distress by causing false memories or fabricated accusations of sexual abuse committed by the nonpatient parent has been satisfied.

*C. Public Policy Considerations*

¶ 103 The final issue is whether public policy considerations weigh against recognizing a limited emotional distress duty. Our analysis of the public policy considerations will closely mirror the analysis in the fifth *Jeffs* factor, with special consideration to any public policy concerns specifically implicated by a limited emotional distress duty, in conjunction with the three overarching policy concerns that frame our negligent infliction of emotional distress case law. *See supra* ¶ 84.

¶ 104 As set out in Part I.B.3, the general policy considerations don't warrant a complete abdication of a traditional duty in this case. However, the policy considerations do warrant limiting the traditional duty to refraining from recklessly causing false memories or fabricated allegations of sexual abuse. *Supra* ¶ 32. Other than the potential that a duty would "chill" a therapist's treatment of the child, none of these policy considerations—the social utility of treating and eradicating sexual abuse, the notion that a duty would place the interests of third parties above the interests of the child, the confidentiality and openness of the therapist-patient relationship, the inexactness of therapy, and the policy behind the reporting immunity statute—requires special consideration when used to implicate an emotional duty. Just as in the traditional duty context, these policy considerations don't support completely eliminating an emotional duty.

¶ 105 As even Mr. Mower acknowledges, therapists are less likely to cause physical injuries than emotional injuries. Logically, a "chilling" effect on the therapy is much more likely to occur if a therapist is burdened with potential liability for a third party's emotional damages. But the limited emotional distress duty that we find in this case won't punish a therapist who comports with the standards required by the practice of his or her profession:

> Importantly, it is not just the nature of the relationship that supports emotional distress damages, but the high likelihood of such damages from negligent acts engaged in by the [therapist]. The duty arises when those acts are illegitimate and, if pursued, are especially likely to produce serious emotional harm. Therefore, the standard is not one that threatens [therapy], but is consistent with the ideals that protect the integrity of [therapy].

*Miranda*, 836 N.W.2d at 33 (discussing this concept in regards to the practice of law).

¶ 106 While the policy considerations don't support eliminating an emotional duty, they do require imposing the same limitations on the emotional duty as they do on the traditional duty. Thus, that determination doesn't end our analysis. We must still consider whether any of the three overarching policy concerns from our negligent infliction of emotional distress case law mandate a different result.

¶ 107 One concern is the genuineness of claims, both in terms of their existence and in causation. *Supra* ¶ 59. But we have no doubt about the genuineness of the claims that will arise under this duty. "We are quite confident that negligent treatment which encourages false accusations of sexual abuse is highly culpable for the resulting injury." *Sawyer*, 595 N.W.2d at 433. Moreover, "we doubt that there is a significant possibility of fraud when a claim is based upon accusations of abuse, particularly in light of the extraordinary stigma our society places upon those accused of sexually abusing a child." *Id.* at 434. And a plaintiff will still be required to offer objective evidence of the severe emotional distress suffered. *Supra* ¶ 88.

¶ 108 Another concern is setting "reasonable limitations on recovery, both in terms of the potential class of victims and the severity of the harm required." *Supra* ¶ 59. The potential class of victims is limited because a claim "may be brought only by those who have been wrongfully accused of sexually abusing their [child], not by the unknown numbers of individuals whose relationship with the patient is negatively affected by the [reckless] therapy." *See Sawyer*, 595 N.W.2d at 434. And the severity of the harm hasn't changed: the plaintiff must still establish that he or she has suffered severe emotional distress.

*Supra* ¶ 77. Thus, the second general policy concern doesn't support eliminating a duty.

¶ 109   The final concern we address is whether plaintiffs should only be allowed to recover for a breach of a duty owed to them. *Supra* ¶ 59. The duty established here is owed not to the child, but to the parent directly. *Supra* ¶ 90. Thus, the parent will be recovering for a duty owed directly to him or her, satisfying this policy concern.

¶ 110   For these reasons, the special policy considerations don't warrant removing liability. Thus, we conclude that a treating therapist has a duty to a minor child's parents to refrain from recklessly giving rise to false memories or fabricated allegations of sexual abuse committed by the plaintiff nonpatient parent through affirmative acts.

¶ 111   We recognize that this conclusion is contrary to some jurisdictions that preclude all liability for therapists who misdiagnose or give rise to false memories or fabricated allegations of childhood sexual abuse. *See, e.g.*, *Trear*, 82 Cal. Rptr. 2d at 283 (holding that a therapist has no duty to the parent of an adult patient for allegedly false recovered memories of sexual abuse); *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1171 (Pa. 2000) (finding no "duty of care beyond that owed to the patient"); *Flanders v. Cooper*, 706 A.2d 589, 589, 592 (Me. 1998) (concluding that a therapist owed no duty of care to the father of a child to avoid causing false memories of sexual abuse); *Zamstein v. Marvasti*, 692 A.2d 781, 789 (Conn. 1997) (refusing to recognize a cause of action against a therapist whose incorrect evaluations led to false charges of sexual assault).

¶ 112   But other jurisdictions have come to a similar conclusion that a therapist may be held liable. *See, e.g.*, *Roberts I*, 866 N.W.2d at 473 ("{A} mental health professional has a limited duty to his or her patient's parents; namely, a duty to ensure that the professional's treatment does not give rise to false memories of childhood sexual abuse."); *Sawyer*, 595 N.W.2d at 430, 436 (imposing liability on a therapist for "damages stemming from injuries caused by a patient's false memories of abuse" (citation omitted)); *Hungerford*, 722 A.2d at 482 (recognizing "a duty of care on therapists who elect to publicize accusations of sexual abuse against parents, or who encourage patients to do so"); *Caryl S.*, 614 N.Y.S.2d at 666 ("[W]hen a professional becomes involved in a case where child sexual abuse is suspected, care must be taken in

investigating and evaluating such a claim and in reaching the conclusion that such abuse did take place."). The jurisdictions that have recognized liability haven't created significant limitations on the damages recoverable. *But see Sawyer*, 595 N.W.2d at 431, 434 (noting that "[t]he harm arising from the loss of a daughters' [sic] companionship is different than the harm that arises from accusations of sexual assault" and finding that those claims are "not tied to personal relationships, but rather to accusations of abuse").

¶ 113   The approach we've taken today serves as a middle ground between the two: we recognize a limited duty to refrain from recklessly causing a nonpatient parent physical harm to his or her body or property or severe emotional distress by giving rise to false memories or fabricated allegations of sexual abuse committed by that parent through affirmative acts when treating the parent's minor child.[21] Our approach is consistent with our case law on duty, negligent infliction of emotional distress, and public policy.

**CONCLUSION**

¶ 114   The question before us today is "whether a [treating therapist] has the unfettered right to treat his or her patient using techniques that might cause the patient to develop a *false memory* [or allegations] of sexual abuse." *Roberts I*, 866 N.W.2d at 472. We

---

[21] Although we've clearly established when a plaintiff may and may not recover for negligent infliction of emotional distress, we've yet to consider whether this claim is truly a separate cause of action that must be independently pled, or whether it is a species of negligence that can be pled as part of such a claim. Because Mr. Mower has only pled medical malpractice (a negligence claim) and not a separate negligent infliction of emotional distress claim, we recognize that he might be unable to recover under an expanded duty for emotional distress. However, we're presented with a limited task—determining if the district court erred in holding that no duty existed. We leave it to the district court to decide in the first instance if Mr. Mower must plead a claim for negligent infliction of emotional distress to recover for such a duty and, if so, if Mr. Mower should be permitted to amend his complaint.

conclude that they don't. Treating therapists are obligated to conform to a standard of care when treating their patients. A therapist further owes a duty to a minor patient's parents to refrain from affirmative acts that recklessly violate the standard of care in a manner that gives rise to false memories or false allegations of sexual abuse committed by the plaintiff nonpatient parent. If the therapist breaches that duty in a way that causes a parent to suffer physical injury, property damage, or severe emotional distress that manifests itself through severe mental or physical symptoms, the therapist may be liable for those damages. The matter is remanded to the district court for further proceedings consistent with this opinion.

———————